With the attorneys who are going to argue the case, please approach the podium, identify yourselves and the party you represent, and indicate to the court how much time you would like for your argument. And note that the microphone is for recording purposes, not for amplification. So if you want to be heard by everybody in the courtroom, please keep your voices up. Robert Markfield Hello, Your Honor. My name is Robert Markfield. I represent Defendant Appellant Anthony Pearson in this matter. I think that 15 minutes should do it for me. Sarah Simpson Good afternoon, Your Honors. Assistant State's Attorney Sarah Simpson on behalf of the people of the state of Illinois, and I anticipate as well on 15 minutes for our argument. Robert Markfield Very well. Robert Markfield May I please require counsel? As I said, I represent Defendant Anthony Pearson. I am going to present issues 1 and 2 in my brief. 3 is in flux before the Supreme Court, and 4, of course, is conceded under Hunter. Robert Markfield The first argument, Your Honors, is Pearson's challenge to the element of intent, which is the men's way of an attempt murder conviction. I recognize that this argument carries a lightness favorable to the state's standard of review, and that the alleged shooter indisputably fired a gun at a wounded Marathon gas station clerk, Muhammad Azar. However, it must be borne in mind that the state's proof falls if the evidence merely establishes intent to incapacitate, intent to inflict great bodily harm, or cruel and callous behavior. There must be a conscious intent to kill. The key facts available from the record to interpret and understand the shooter's act, that is, to provide a window into the shooter's intent, establish two things, all the three facts I'm going to say establish two things, that cut against intent to kill, and that cut in favor of the following conclusions. One, that the shooting was highly, highly impulsive, and two, that the shooter's actions were just directed and motivated by an intent to obtain money from the cash register, to steal money from the cash register at the gas station, not to kill, not to kill a man. That's not why he was there. Now the three facts I'm talking about are the first, when the shooter entered the gas station, the window was open to the attendance station. He did not at that time fire his gun. He did not fire his gun. His head, his body was completely covered. The only thing visible was his two eyes and a gun in his hand. He pointed at the chest of this victim. Yes, Your Honor. That's to the mask. And you say that manifested intent just to get money and not to commit a deadly act. That's exactly what I'm saying. On what basis do you reach that, sir? I'm making that conclusion on the basis of three facts. One, as I was about to argue, the first, when he entered, he did not immediately use the gun as he could have. He might have even had a clearer shot because there had been no resistance yet. That's the first. The second, which is much, much more important, is that after firing the gun, the window of the cash station, clerk's office is open, the clerk is shot, he's on the ground moaning, horrible situation, and then the shooter, he uses his gun again. But he does not use his gun to shoot Azhar, as he might well have done if he wanted to kill, as he would have done if he wanted to kill. The man's lying on the ground. He uses his gun again to pound on the cash register in an evident attempt to get it open to accomplish his robbery. Courts, I believe, have been sort of clear on the principle that no matter how chaos the behavior of the defendant is, if there's an opportunity to kill, if there's a clear opportunity, proximity, fellow power, and time, and the defendant does not avail himself of that opportunity, then that cuts strongly, strongly against intent to kill. Well, after he's shot once, and this victim is laying on the floor gagging or whatever, how could he have concluded, well, he's not dead, so I'm not going to put another bullet in him? I don't understand what you're saying when you say he did use the opportunity to shoot more. In his mind, he may have said, well, I got him down on the ground, I got him in the chest. This guy's a goner. He's dead moments from now. I don't know whether anybody would draw that conclusion from one gunshot when the person is moving and moaning on the ground. If he had wanted to kill, it would have taken just a split second to... Could a reasonable jury infer that when the victim resisted opening the sliding glass window and the defendant struggled with him to open it and took out a gun and shot him in the chest, could a reasonable jury infer that he meant to kill him? I think that the fact that, I mean, the struggle was over access to the clerk's area where the... Right. I don't think that that fact, the fact that it happened after a struggle, which, by the way, was like a three-second long struggle... Could a reasonable jury infer that? extreme youth and motivation to, you know, to steal. If there was anything that corroborated or bolstered an intent to kill, then yes, maybe that fact should support an intent to kill. But alone, no, I don't think that the fact that it came after a three-second struggle in which the defendant's aim could just as easily, more likely have been to get money from the cash register to eliminate an obstacle that was in his path. I mean, why not that instead of killing, intent to kill? In addition, correct me if I'm wrong, the state says Amir lost consciousness during the 9-1-1 call. So he gets shot, he goes down and he calls 9-1-1, and then he loses consciousness. I'm not sure about this. You were saying he was making noises and doing these things. Is that in the record somewhere? I looked... I mean, I will apologize and stand corrected if I'm wrong, but as I watched the videotape exhibit, which is in the record, it seems to suggest the audio and the visual that he spent... that as soon as he was hit on the ground, he spent the first few seconds, the first several seconds, in fact, moaning, and then he was able to make a call. That happened before he lost consciousness, and it happened immediately after he was shot. So, you know, at least for a short period of that time, you know, the shooter was there. You want to proceed to your next? Okay. Yes, Your Honor. Okay. Now, as I read the state's brief, I don't think that they strongly contest that hearsay and confrontation clause error occurred. When the state's latent fingerprint expert, Karen Hurd, testified over objection, that her working conclusions were verified by a second expert latent fingerprint evaluator named Heidi Heitzman. Let's assume that was error. How is he prejudiced? So, Your Honor? How is the defendant prejudiced by the testimony? Well, unfortunately, it wasn't... on jury, the highly impactful nature of this error, and combined with the very closely balanced nature of the evidence. As for the former, I mean, verification is an essential element of a fingerprint identification, and that makes it not merely corroborative, because if the original identification, if the first examiner's identification lacked verification, it would have been destroyed by the defense counsel as noncompliant with the protocol, nonscientific, perhaps even pseudoscientific. Did that happen here? It did not. If it didn't happen here, then the live testimony went in relatively unscathed, right? That's right. Okay. So now you have a simple comment, hearsay, inadmissible statement that it was corroborated by my colleague. How is that prejudicial? It is... well, I would say that it's much more serious than that, because you do not have a first complete identification without verification. Verification is an element of the identification, analogous perhaps to an element of an offense in a crime. If you do not have it, it is nonconforming to protocol. And here, I mean, she said that they have it, but it seems almost as bad as not having it to have the jury be allowed to just assume the propriety of the identification that the verifier's identification matched up sort of in lockstep to the original expert's identification, that her qualifications were in order, that her examination was thorough. All of that was sort of... it was allowed to be assumed by the fact that the original examiner, Karen Heard, just said, yes, my conclusions were verified. And importantly, adding significantly to the prejudice, the state argued in Ravello's closing argument the substantive value of the verification. It was given the benefit of a very strong piece of evidence that shifted the balance, I believe, towards conviction in a case where there otherwise would not have been a conviction.  I say closely balanced. If you subtract the fingerprint identification, it is very closely balanced. It is true that the gun and the clothing were found in various places, but they were found in co-defendant Marnie Allen's house and not in D'Anthony Pearson's house. The only sort of bridge between Allen and his other co-defendant Collins and defendant was the highly unreliable testimony of Allen's own girlfriend, Cara Boyd. She's the girlfriend of Allen, so she's very motivated to minimize Allen's knowledge and involvement and implicate somebody else. And her evasion and unreliability are underscored by the testimony of Allen's mother, who testified that she and Boyd met with Allen's lawyers a few days after the incident. And Boyd said, I don't know anything about this incident. I didn't hear anything. I didn't see anything. And then when Boyd is on the stand, she was asked about this, and she conveniently didn't remember. I said, didn't remember even talking to this lawyer. I said conveniently because her memory was clear about conversations that she had with the police at exactly the same time. So without the fingerprint identification, all we really have, I believe, is Boyd. There were Nike shoes, I believe, and a green Nokia phone found in the defendant's home, but those are hardly enough to sustain a conviction. I mean, I imagine that cell phones and shoes from these big companies are common. They're not of rare-maker design. So, you know, without the scientific evidence, I think that this was improper. It was a confrontation clause and hearsay violation. This conviction would not have happened, and I ask the court to reverse. Thank you, Your Honors. Thank you. Ms. Simpson. May it please the Court. Assistant State's Attorney Sarah Simpson on behalf of the people of the State of Illinois. The evidence in this case proved beyond a reasonable doubt that the defendant had a specific intent to kill the victim, Amir Mohammed Azhar, while he shot him in the chest at the Marathon gas station on September 29, 2010. Now, because specific intent is a state of mind, it's rarely proved through direct evidence. So we must look at the circumstances in this case to establish if the evidence before the jury supported their finding that the defendant had specific intent to kill Amir. And the evidence in this case overwhelmingly supported the jury's verdict. If the defendant armed himself with a deadly weapon when he went into that Marathon gas station, he then aimed that weapon during the entire time that the struggle was occurring through the glass at the victim, Amir Mohammed. And at that time when he could not complete his armed robbery, when the victim stood in the way, he shot the gun at point-blank range from a foot to a foot and a half away from him, and he shot the man directly in the chest. And the fact of firing a gun alone shows that a person acted with the intent to kill because the natural consequence of shooting a victim in the chest would be the loss of life. In addition, the evidence showed that this action was purposeful. The firearm examiner in this case testified that he tested the trigger pull of that firearm, which was found in the co-defendant's house and linked to the shell casing that was found at the scene, and found that the trigger pull was seven to seven and a half pounds, which the examiner testified is not a light trigger pull that could have gone off accidentally. In addition, the defendant suffered life-threatening injuries, but for the fact that he was able to get emergency medical care, this clearly would have been a homicide. Now the defendant pointed to two points to negate his intent in this case. The first, he said that if he'd had that ample opportunity to kill him, he would have. But as this Court has recognized, the victim and meter lie moaning and gagging on his own blood as his lung cavity is filled with blood for seconds afterwards. The defendant, based on the circumstances that are shown on the video of the crime, likely thought that he did complete his crime, that he did kill the victim, and there would be no reason for him to shoot him again when the man lied, dying essentially in the employee area of that convenience store. And now counsel said that one gunshot wound, he wouldn't think that that would be enough to kill him, but that gunshot wound was to the chest. And when he made a comment, and counsel refers to in his brief that he didn't know where he shot him, from looking at the video, his choices were above the waist. So that gun pointed at his chest from a foot away. It was clear that that would have either been the chest or the abdominal cavity or his head, all of which are life-ending shots. So the fact that he shot him a foot away and that caused the victim to be incapacitated immediately certainly shows that he had the specific intent to kill him. Now, the defendant also points to the fact that this is an impulsive act, but impulsivity and specific intent are not mutually exclusive. And the fact that he was a youth, and even he's, counsel is using his youth as a factor in the sufficiency of the evidence claim when that has been a factor that courts have been looking at in sentencing claims, as he points out in Issue 3 of his brief. In no way, and counsel acknowledges in his own brief, that in no way does age alone negate the fact that he can form that specific intent to kill. And in fact, adults often make impulsive decisions and specifically intend to kill people under similar circumstances. By looking at the video, which is very telling evidence of this crime, it shows that in those moments when Amir had frustrated the defendant's attempts to get to that cash register and to that safe, he formed a specific intent to get this person out of his way so he could later get into that cash register and try to get the proceeds for that robbery. And because that intent could be formed in a matter of moments, the evidence in this case certainly supported the jury's verdict that the defendant had the specific intent to kill at the time that he shot the victim. Now, turning to the defendant's second issue in this case, having to do with the testimony of the firearms examiner. Now, there was no plain error in the latent print examiner's testimony. And it's important to look at, in this issue, exactly what is at issue here. The latent print examiner, there was a fingerprint that was left on the glass between the victim and the shooter during the robbery. That print was lifted and sent to the Illinois State Police, where a firearm examiner testified that she matched that print, the palm and one of the fingers, to the defendant, D'Anthony Pearson. In telling the jury about her methodology that led her to make her scientific conclusions, she described the procedure that the Illinois State Police employs when doing testing. And this is common to firearm examiners and fingerprint technicians, drug chemists. And it's called the ACE-V procedure, standing for Analysis, Comparison, Evaluation, and V standing for Verification. She told them that that was the procedure she followed and that was the procedure that was followed in this case. Now, importantly, the defendant does not object to any of this testimony. He didn't object to trial below, and he's not objecting now in his brief, that the methodology that the firearm examiner followed, that methodology could be put forth before the jury. So what he's arguing now is the one single question asked to her, where she said if she learned the results from that verification, and her answer was the verifier concurred with the verification and the correct markings, that that one answer is such that would tip the scales of justice against him. And because that was not included in this post-trial motion, he has forfeited review of that claim, and it has to go under a plain error analysis. And the defendant agrees that second-pronged plain error isn't appropriate in this case, so it would have to be a first-pronged plain error, and the evidence would have to be so closely balanced that this one question would tip the scales of justice against him. And in this case, the evidence is simply overwhelming, and the defendant cannot meet that burden. And just to point out briefly on the evidence, the defendant points out that the clothing that was found was found in Allen's bathtub. This is distinctive clothing as shown in the video of the shooting. The shooter in this case, the defendant, wore a purple hooded sweatshirt with a yellow emblem on the back and green pants. The co-offender, who was the lookout, wore a blue and white sweatshirt with the numbers 1947 distinctly visible. These exact articles of clothing were found in the bathtub at Armani's Allen's home, where a defendant was linked to by the testimony of Kara Boyd. Kara Boyd said the defendant had a gun beforehand, that the defendant pointed the gun at her while with Collins and Allen, that they left, and the defendant came back to this same house afterwards, and then the gun was found in this house by the police when they searched. So the defendant is linked intrinsically to this house. The clothing was found in this house. The gun that was found in this house was linked to the crime. And the defendant's fingerprints were found on the glass where the shooter put his hand to try and get into the employee area. Now, the defendant pointed out that Kara, he argues, is unreliable, but it should be noted that Kara, at the time of the trial, testified that she was no longer dating Armani Allen, the co-defendant, that she didn't even testify before Armani Allen's jury. So there's no reason that she would possibly be biased to try and make defendants seem more culpable and Allen seem less culpable. In fact, she also denied saying to Allen's attorney that she didn't see anything. Her testimony was subject to cross-examination, and she was very credible in what she said and what the statement that she overheard the defendant saying to Allen and all the circumstances surrounding the crime. And the last thing I just want to touch on is the counsel had pointed out that this evidence is problematic because the prosecutor argued it substantively, and that simply is not the case. If you look at the prosecutor's comments about verification, that's actually in response to the defense counsel's argument, where his whole position with the fingerprints was that it was sloppily done, that she didn't take adequate notes, that the verification didn't even really occur. I think at one point the defense counsel argued, why do we need a verifier, and what does verifiers do besides sign their name to the work? So in response to that, the prosecutor simply got out and said that the lab notes were proper and that the verification occurred. And no time did she argue it substantively, and she simply responded to the defense counsel's argument that it wasn't even sure that the lab procedure was taken properly. So for those reasons, the defendant cannot make this burden of showing plain error, that the evidence was overwhelming, and this minor hearsay answer did nothing to tip the scales against the defendant. If there are no questions? No, thank you. As to the remaining issues, we will address in our brief, and the people of the state of Illinois respectfully request that this court affirm the defendant's conviction and sentence for attempt first-degree murder and attempt on robbery. Thank you. Counsel? One question. But in latent expert heard some words, the ACV protocol gives scientific support for what we are doing, and that one question went to the essential element of the protocol that gave scientific support to what they're doing. So the state is allowed to prove essentially the whole identification, the scientific validity of the identification based on hearsay, and that is pretty important even though it was one question. And, you know, well, that is the one point that I want to make on rebuttal, if there's any questions. Okay, thank you, Mike. Thank you. On behalf of the panel, we'd like to thank you for your excellent briefing and argument on this matter. We will take it under advisement that the court stands in recess. Thank you.